UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

SHERRY SCALERCIO-ISENBERG,

                          Plaintiff,

          -v.-

GOLDMAN SACHS MORTGAGE COMPANY
and MTGLQ INVESTORS LP,

                          Defendants.

21 Civ. 4124 (KPF)

**OPINION AND ORDER**

KATHERINE POLK FAILLA, District Judge:

*Pro se* Plaintiff Sherry Scalercio-Isenberg brings suit against Defendants Goldman Sachs Mortgage Company ("GSMC") and MTGLQ Investors LP ("MTGLQ," and together with GSMC, "Goldman Sachs"), asserting a variety of claims relating to Defendants' handling of Plaintiff's mortgage.  Plaintiff asserts nine causes of action, the majority of which stem from Plaintiff's allegation that Defendants have inaccurately stated her mortgage balance.  Defendants now move to dismiss the Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).  For the reasons discussed in the remainder of this Opinion, the Court grants Defendants' motion to dismiss.

## BACKGROUND[1]

### A.    Factual Background

### 1.    The Mortgage

Plaintiff is a New Jersey resident whose home is located in Sparta, New Jersey.  (Mortgage ¶ Q).  Plaintiff's interest in her residence is encumbered by a

---

[1]    This Opinion draws its facts from the Amended Complaint ("Am. Compl." (Dkt. #21)), the well-pleaded allegations of which are taken as true on this motion.  *See Ashcroft* v.

mortgage loan, the lender of which was Quicken Loans, Inc., a non-party to this lawsuit.  (*Id.* at ¶ D).  Plaintiff obtained the Mortgage in November of 2010. (*Id.* at ¶ A).  Under the Mortgage, Plaintiff is required to make certain "Periodic Payments," which include amounts due on the principal and interest on the loan, as well as funds put towards an escrow account.  (*Id.* at ¶ O; *see also id.*, § 2).[2]  The Mortgage also states: "[a]t origination or at any time during the term of the Loan, Lender may require that Community Association Dues, Fees, and Assessments, if any, be escrowed by Borrower, and such dues, fees and

---

*Iqbal*, 556 U.S. 662, 678 (2009).  The Court sources additional facts from the exhibits appended to the Amended Complaint, which are deemed part of the pleadings.  Fed. R. Civ. P. 10(c).  The Court refers to Plaintiff's exhibits to her Amended Complaint (Dkt. #23-32) using the convention "Pl. Ex. [ ]," which is the same convention Plaintiff uses in her Rule 26 disclosure (Dkt. #22).  The Court also considers the mortgage at issue ("Mortgage" (Dkt. #34, Ex. 1B)), which was attached to the Declaration of Frank Morreale submitted in support of Defendants' motion to dismiss (Dkt. #34).  *See Chambers* v. *Time Warner*, 282 F.3d 147, 153 (2d Cir. 2002) ("Even where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint.").  And the Court has considered certain of Plaintiff's assertions in her opposition submission, to the extent they are not inconsistent with her pleadings.  *See Reid* v. *City of New York*, No. 20 Civ. 9243 (KPF), 2022 WL 2967359, at *6 (S.D.N.Y. July 27, 2022).

For ease of reference, the Court refers to Defendants' memorandum of law in support of their motion to dismiss as "Def. Br." (Dkt. #35); Plaintiff's memorandum of law in opposition to Defendants' motion to dismiss as "Pl. Opp." (Dkt. #36); and Defendants' reply memorandum of law as "Def. Reply" (Dkt. #37).

[2]  Paragraph O defines Periodic Payments as the "regularly scheduled amounts due for (i) principal and interest under the Note, plus (ii) any amounts under Section 3 of this Security Instrument."  (Mortgage ¶ O).  Section 2 of the Mortgage reads:

> Except as otherwise described in this Section 2, all payments accepted and applied by Lender shall be applied in the following order of priority: (a) interest due under the Note; (b) principal due under the Note; (c) amounts due under Section 3.  Such payments shall be applied to each Periodic Payment in the order in which it became due.  Any remaining amounts shall be applied first to late charges, second to any other amounts due under this Security Instrument, and then to reduce the principal balance of the Note.

(*Id.*, § 2).

2

assessments shall be an Escrow Item." (*Id.*, § 3).  Section 3 further notes that: "[i]f Borrower is obligated to pay Escrow Items directly, pursuant to a waiver, and Borrower fails to pay the amount due for an Escrow Item, Lender may … pay such amount and Borrower shall then be obligated … to repay to Lender any such amount." (*Id.*).

### 2.    Defendants' Alleged Mortgage Fraud

The relevant timeframe for Plaintiff's allegations begins in 2019.  Plaintiff alleges that Metropolitan Life Insurance Co. ("MetLife") owned her mortgage and that Shellpoint Mortgage Servicing ("Shellpoint") serviced it from January 1, 2019, to March 31, 2019.  (Am. Compl. 4 ¶ 1).[3]  This arrangement is partially reflected by Plaintiff's payment of $3,131.19 to Shellpoint in March 2019.  (Pl. Ex. 0).

Plaintiff alleges that, on or about April 1, 2019, MTGLQ, a Goldman Sachs entity, acquired the loan from MetLife.  (Am. Compl. 4 ¶ 3). Plaintiff claims that she was "informally" made aware of this transfer of ownership by means of an email from Shellpoint dated April 1, 2019, in which Shellpoint requested verification of Plaintiff's mailing address and the last four digits of her social security number.  (*Id.* at 4 ¶ 4; Pl. Ex. 1).  Shellpoint's email to Plaintiff then stated: "Additionally, your loan is no longer owned by MetLife. Your loan was sold back to MTGLQ Investors L.P." (Pl. Ex. 1).

---

[3]    The Amended Complaint does not use consecutively numbered paragraphs.  For ease of reference, the Court cites to the Amended Complaint using both the relevant page number and paragraph number.

After learning that her mortgage loan had been transferred to MTGLQ, Plaintiff became "concerned and alarmed" about the lack of formal notice given to her regarding the transfer of ownership of her loan.  (Am. Compl. 4-5 ¶¶ 5-8).  Between April and November of 2019, Plaintiff made several unsuccessful attempts to contact Goldman Sachs and MTGLQ to discuss her loan.  (*Id.* at 5-6 ¶¶ 6-12).  Plaintiff also visited the New York Attorney General's Office on two occasions to voice her concerns.  (*Id.* at 5 ¶ 10).

On November 25, 2019, Plaintiff received a formal notice, dated November 22, 2019, alerting her that ownership of her loan had been transferred to Legacy Mortgage Asset Trust 2019-GS7.  (Am. Compl. 5-6 ¶ 11; Pl. Ex. 8).  The notice also stated that the mortgage servicer would continue to be Select Portfolio Servicing, Inc. ("SPS").  (Pl. Ex. 8).[4]  Though the notice appeared "legitimate" to Plaintiff at first, she alleges that she quickly spotted "inaccuracies" about the previous mortgage servicer in the notice, in addition to differences in the amount of money said to be due.  (Am. Compl. 6 ¶ 11).  Specifically, Plaintiff calls attention to the original principal balance on her loan, which the notice lists as $617,975.00 and which Plaintiff claims should have been $515,896.14.  (Pl. Ex. 8).  Plaintiff also alleges that SPS "demand[ed]" an immediate payment of over $75,000, the non-payment of which would result in the foreclosure of Plaintiff's residence.  (Am. Compl. 6

---

[4]     Plaintiff's Amended Complaint and attached exhibits do not make clear the exact point at which SPS became the servicer of Plaintiff's loan.  The Court intuits that SPS became the servicer of Plaintiff's loan at some point after March 2019, based on the March 2019 mortgage payment to Shellpoint provided by Plaintiff and Shellpoint's April 1, 2019 email to Plaintiff.  (*See* Pl. Ex. 0, 1).

¶ 11).  According to Plaintiff, she and her husband were "suddenly being held hostage" by Goldman Sachs and SPS, who were using "extortion tactics" and "demanding a form of Ransom[] money[.]"  (*Id.*).[5]

Plaintiff alleges that she made an appointment to discuss the status of her mortgage payments with Karen Seymour, then the General Counsel of Goldman Sachs, and further alleges that Seymour failed to appear for this meeting.  (Am. Compl. 6 ¶ 12).  By December 16, 2019, Plaintiff had grown "angry" about both the misrepresentations on her mortgage statements and Goldman Sachs's failures to discuss her concerns with her.  (*Id.* at 6 ¶ 13).  Plaintiff sent an additional email to Seymour on this date, copying also David Solomon, the CEO of Goldman Sachs.  (*Id.* at 7 ¶ 14; Pl. Ex. 5).

On January 3, 2020, Plaintiff received a phone call from Frank Morreale, outside counsel for Goldman Sachs.  (Am. Compl. 7 ¶ 15).  During this phone call, Plaintiff reiterated her concerns about mortgage fraud, and Morreale stated that he would speak with Goldman Sachs's representatives and contact Plaintiff thereafter.  (*Id.* at 7-8 ¶¶ 16-24).  Plaintiff then sent Morreale an email on January 7, 2020, in which she stated that she had not received information about where to send her January 2020 mortgage payment.  (Pl. Ex. 10).

---

[5]    Despite a close review of the notice, which is a supporting exhibit attached by Plaintiff to her Amended Complaint (Pl. Ex. 8), the Court could not verify certain allegations made by Plaintiff, including those about SPS's threat of foreclosure or the demand for the immediate payment of $75,000.

### 3.  The Settlement Agreement

One week later, on January 14, 2020, Plaintiff received a draft version of a Settlement Agreement from Morreale, on behalf of Goldman Sachs.  (Am. Compl. 9 ¶ 27).  After reviewing this draft document and making edits in blue pen, Plaintiff called Morreale to discuss her concerns further.  (*Id.* at 9 ¶ 28). Eventually, after several conversations, Plaintiff and Morreale agreed on the "spirit and intent" of the contract, and Morreale added several "key" paragraphs to assuage specific concerns held by Plaintiff.  (*Id.* at 9-10 ¶ 28).

The Settlement Agreement was signed by Plaintiff and her husband on January 15, 2020, and by a GSMC representative on January 21, 2020.  (Pl. Ex. 14).  "[W]ithout admitting any liability and solely to avoid litigation and to buy peace," GSMC agreed to pay the total sum of $2,500.00 (the "Settlement Payment") to Plaintiff and her husband within 30 days of the receipt of the settlement documents by Goldman Sachs's counsel.  (*Id.* at ¶ 1).  In consideration of this Settlement Payment, Plaintiff and her husband agreed to:

> unconditionally, irrevocably, forever and fully release, acquit, and forever discharge GSMC and its servicers, predecessors, successors, assigns, parents, affiliates, subsidiaries, and related entities, and each of their respective present and former officers, employees, directors, shareholders, advisors, insurers, attorneys, representatives and agents … of and from any and all claims, demands, actions, causes of action, suits, liens, debts, obligations, promises, agreements, costs, damages, liabilities, and judgments of any kind, nature, or amount whether in law or equity, whether known or unknown, anticipated or unanticipated, liquidated or unliquidated, relating to, arising out of, or in connection with the Loan, the Mortgage and the Property to the extent in any fashion arising from, or related to, events from the beginning of time up until, and through, the

> Effective Date (the "Released Claims"), including, without limitation, any and all Claims, and including, without limitation, any and all claimed or unclaimed compensatory damages, consequential damages, interest, costs, expenses and fees (including reasonable or actual attorneys' fees), that Releasors have, or may have, against the GSMC Releasees from the beginning of time up until and through the Effective Date.

(*Id.* at ¶ 3).

In her Amended Complaint, Plaintiff highlights two other sections of the Settlement Agreement that she believes to be relevant to her claims. The first is Section 8, which is entitled "Warranties and Representations" and which provides:

> Each Party hereto warrants and represents that it has not assigned, transferred, conveyed, or purported to assign, transfer, or convey to any person or entity any right, claim, action, cause of action, suit (at law or in equity), defense, demand, debt, liability, account, or obligation herein released, or any part thereof, or which would, absent such assignment, transfer or conveyance, be subject to the releases set forth in this Agreement.

(Pl. Ex. 14 ¶ 8). The second provision to which Plaintiff points is Section 13, which is entitled "Further Assurances" and which provides:

> Each Party agrees to do all acts and things and to make, execute, acknowledge and deliver such written documents, instructions and/or instruments in such form as shall from time to time be reasonably required to carry out the terms and provisions of this Agreement, including but not limited to, the execution, filing or recording of any reporting documents, affidavits, deeds or agreements. Each Party further agrees to give reasonable cooperation and assistance to the other Party in order to enable other the Party to secure the intended benefits of this Agreement.

(*Id.*, ¶ 13).

Plaintiff claims that she had an "uneasy feeling" about the Settlement Agreement, but that she signed it nonetheless because she was "desperate" to correct the inaccuracies in her mortgage statements. (Am. Compl. 10 ¶ 29). According to Plaintiff, she was comforted by the fact that Morreale "led [her] to believe" that Goldman Sachs would contact SPS upon the signing of the Settlement Agreement to demand the correction of her mortgage statements and resolve any outstanding issues pertaining to the loan. (*Id.* at 12 ¶ 37). Plaintiff also cites Defendants' "harassment with early morning, Saturday mail deliveries of Certified Letters, requiring a signature" as a factor that induced her to sign the contract. (*Id.* at 9-10 ¶ 28). Ultimately, Plaintiff claims that she had "no other choice but to sign" the Settlement Agreement, because doing so was her "only hope to get help as a Customer of Goldman Sachs" and to obtain relief from the "harassment" that she was experiencing. (*Id.* at 10 ¶ 29).

### 4. Defendants' Post-Settlement Conduct

Plaintiff's concerns persisted despite the execution of the Settlement Agreement. Plaintiff asserts that, while she was engaged in discussions with Morreale about the Settlement Agreement, SPS was diverting her mortgage payments into an "Unapplied Account" while reporting her payments late, instead of making efforts to correct her allegedly inaccurate mortgage statements. (Am. Compl. 10 ¶ 31). Additionally, Plaintiff claims that Goldman Sachs sold her loan to U.S. Bank National Trust Association soon after the Agreement was effectuated, thereby preventing Plaintiff from obtaining more information about and correcting the inaccurate statements. (*Id.* at 11 ¶ 34).

8

In Plaintiff's estimation, Goldman Sachs made an "intentional" decision to transfer ownership of her mortgage loan after she "called out" its fraud and after it failed to correct her mortgage statements. (*Id.* at 12 ¶ 35).

Plaintiff also alleges that Defendants' counsel crafted a "false Police report" following the execution of the Settlement Agreement, which request prompted several police officers to request to search her home for guns. (Am. Compl. 13 ¶ 39(c)). An investigation revealed that a law firm, PIB, had filed "false email documents" to obtain a TERPO (short for "Temporary Risk Protective Order") Search Order in a township several miles away from Plaintiff's own. (*Id.* at 13 ¶ 40). Plaintiff contends that the Sparta Chief of Police, Neil Spidaletto, opened an "Internal Affairs investigation" into the matter, but does not explain what, if anything, came of the investigation. (*Id.* at 14 ¶ 41).

## B. Procedural Background

Plaintiff filed this action on May 6, 2021. (Dkt. #1). On June 14, 2021, Defendants submitted a letter requesting a pre-motion conference to discuss their contemplated motion to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(6), and 9(b), or, in the alternative, their contemplated motion for a more definite statement pursuant to Rule 12(e). (Dkt. #16). On July 7, 2021, the Court held a telephonic pre-motion conference at which it set a briefing schedule for Plaintiff to file an amended complaint and for Defendants to file their anticipated motion to dismiss. (Dkt. #19).

Plaintiff filed her Amended Complaint on September 6, 2021 (Dkt. #21), attaching several exhibits (Dkt. #22-32). Defendants filed their motion to dismiss and supporting papers on October 15, 2021. (Dkt. #33-35). Plaintiff filed her opposition to Defendants' motion to dismiss on November 29, 2021 (Dkt. #36), and Defendants filed their reply to Plaintiff's opposition on December 13, 2021 (Dkt. #37). Accordingly, Defendants' motion to dismiss is fully briefed and ripe for the Court's consideration.[6]

## DISCUSSION

### A. Motions to Dismiss Pursuant to Federal Rule of Civil Procedure 12(b)(6)

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)). "A claim is facially plausible 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Allco Fin. Ltd.* v. *Klee*, 861 F.3d 82, 94-95 (2d Cir. 2017) (quoting *Iqbal*, 556 U.S. at 678). In reviewing a Rule 12(b)(6) motion to dismiss, a court must "draw all reasonable inferences in Plaintiff['s] favor, assume all well-pleaded

---

[6]     In April 2022, while the instant case was pending, Plaintiff brought a separate civil action in this District against SPS, Credit Suisse Group, and others. *See Scalercio-Isenberg* v. *Credit Suisse Grp.*, No. 22 Civ. 3208 (LTS). In May 2022, that case was transferred to the United States District Court for the District of New Jersey, where it remains pending. *See Scalercio-Isenberg* v. *Credit Suisse Grp.*, No. 22 Civ. 2705 (KM) (AME) (D.N.J.). An earlier action by Plaintiff against SPS in that District was dismissed with prejudice in January 2021. *See Scalercio-Isenberg* v. *Select Portfolio Servicing, Inc.*, No. 20 Civ. 4501 (AET) (LHG) (D.N.J.).

factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks and citation omitted).

A court adjudicating a motion to dismiss under Rule 12(b)(6) "may review only a narrow universe of materials." *Goel* v. *Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016). This narrow universe includes the "facts stated on the face of the complaint, documents appended to the complaint or incorporated in the complaint by reference, and matters of which judicial notice may be taken." *Id.* (internal alterations and citation omitted); *accord United States ex rel. Foreman* v. *AECOM*, 19 F.4th 85, 106 (2d Cir. 2021). Additionally, "[e]ven where a document is not incorporated by reference, the court may nevertheless consider it where the complaint 'relies heavily upon its terms and effect,' which renders the document 'integral' to the complaint." *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002) (quoting *Int'l Audiotext Network, Inc.* v. *Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995)). "In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may [also] rely on the plaintiff's opposition papers" to the extent they are consistent with the operative pleading. *Vlad-Berindan* v. *MTA N.Y.C. Transit*, No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) (collecting cases); *see generally Walker* v. *Schult*, 717 F.3d 119, 122 n.1 (2d Cir. 2013).

"[C]ourts must construe *pro se* pleadings broadly, and interpret them 'to raise the strongest arguments that they suggest.'" *Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (citing *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir.

11

1996)); *cf.* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice."). "However inartfully pleaded, a *pro se* complaint may not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of her claim which would entitle her to relief." *Legeno* v. *Corcoran Grp.*, 308 F. App'x 495, 496 (2d Cir. 2009) (summary order) (quoting *Posr* v. *Ct. Officer Shield No. 207*, 180 F.3d 409, 413-14 (2d Cir. 1999)) (internal quotation marks and brackets omitted). "This policy of liberally construing *pro se* submissions is driven by the understanding that '[i]mplicit in the right of self-representation is an obligation on the part of the court to make reasonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training.'" *Triestman* v. *Fed. Bureau of Prisons*, 470 F.3d 471, 475 (2d Cir. 2006) (quoting *Traguth* v. *Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)).

Still, a *pro se* plaintiff is required to include factual allegations that are "enough to raise a right to relief above the speculative level[.]" *Twombly*, 550 U.S. at 555. "[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (internal quotation marks, alterations, and citation omitted); *see also Rolon* v. *Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (explaining that a court need not accept "conclusory allegations or legal conclusions masquerading as factual conclusions" (internal quotation marks omitted)).

**B.**     **The Settlement Agreement Is a Valid and Enforceable Contract That Defendants Did Not Breach**

At the outset, the Court addresses the validity and enforceability of the Settlement Agreement between Plaintiff and Defendants.  The Settlement Agreement is at the very heart of this case, because it potentially operates as a release of some or all of Plaintiff's claims against Defendants.  Indeed, Defendants' motion is styled as both a "Motion to Dismiss First Amended Complaint, and Motion to Enforce Settlement Agreement."  (Dkt. #33).

Plaintiff argues that her Settlement Agreement with Defendants is either void or voidable for three reasons.  *First*, Plaintiff asserts that the Agreement is invalid because she signed it under duress.  (Am. Compl. 10 ¶ 31).  *Second*, Plaintiff alleges that she was fraudulently induced into signing the Agreement. (*Id.* at 12 ¶ 37; *see also id.* at 15).  *Third*, Plaintiff argues that even if the Agreement were not flawed from its inception, Defendants materially breached the terms of the Agreement such that Plaintiff is excused from performance. (*Id.* at 15-16).  The Court considers each argument in turn, but ultimately finds none of them to be availing.

"It is well established that '[s]ettlement agreements are contracts and must therefore be construed according to general principles of contract law.'" *Bldg. Serv. 32BJ Health Fund* v. *Nutrition Mgmt. Servs. Co.*, 789 F. App'x 248, 252 (2d Cir. 2019) (summary order) (quoting *Red Ball Interior Demolition Corp.* v. *Palmadessa*, 173 F.3d 481, 484 (2d Cir. 1999)); *accord McNamara* v. *Tourneau, Inc.*, 464 F. Supp. 2d 232, 237 (S.D.N.Y. 2006).  Thus, a settlement agreement, just like any contract, requires "an offer, acceptance, consideration,

mutual assent and intent to be bound" to be enforceable.  *Prince of Peace Enters., Inc.* v. *Top Quality Food Mkt., LLC*, 760 F. Supp. 2d 384, 397 (S.D.N.Y. 2011) (internal quotation marks omitted).[7]  Notably, "[f]ederal courts … have 'articulated a strong policy in favor of enforcing settlement agreements and releases.'"  *Pucilowski* v. *Spotify USA, Inc.*, No. 21 Civ. 1653 (ER), 2022 WL 836797, at *4 (S.D.N.Y. Mar. 21, 2022) (quoting *Levine* v. *Bd. of Educ. of City of New York*, 152 F.3d 919, 1998 WL 386141, at *2 (2d Cir. 1998) (summary order)).  "Nevertheless, because settlement agreements are contracts, they may be invalid when fraud, duress, illegality, or mutual mistake is shown."  *Levine*, 1998 WL 386141, at *2.

### 1.    Plaintiff Has Not Alleged Facts Demonstrating That She Entered into the Settlement Agreement Under Duress

The Court begins by considering Plaintiff's argument that the Settlement Agreement is void because she signed it under duress.  To review, Plaintiff alleges that, at the time of signing, she "was under Severe Duress and felt there was no other choice but to sign the contract[.]"  (Am. Compl. 10 ¶ 31). Defendants contend that Plaintiff's allegations of duress are conclusory, and in any event are contradicted by Plaintiff's own recounting of the facts leading up to the signing of the Settlement Agreement.  (Def. Reply 5).  For example,

---

[7]     The Settlement Agreement contains a "Governing Law" provision stating that the Agreement "shall be governed by the laws of the State of New York and any questions arising hereunder shall be construed or determined according to such law."  (Pl. Ex. 14 ¶ 12).  The Court will enforce this provision and apply New York law to the dispute at hand.  *See Fireman's Fund Ins. Co.* v. *Great Am. Ins. Co. of N.Y.*, 822 F.3d 620, 641 (2d Cir. 2016) ("'Generally, [New York] courts will enforce a choice-of-law clause so long as the chosen law bears a reasonable relationship to the parties or the transaction.'").

Defendants point out that Plaintiff concedes that the "settlement negotiations included 'emails and phone conversations'" between the parties, which they claim evinces a fair process.  (*Id.*).

Under New York law, repudiation of a contract based on duress requires a party to demonstrate "both [i] a wrongful threat and [ii] the effect of precluding the exercise of free will." *United States* v. *Twenty Miljam-350 IED Jammers*, 669 F.3d 78, 88 (2d Cir. 2011) (internal citations and emphases omitted).  "In characterizing a 'wrongful threat,' New York 'law demands threatening conduct that is wrongful, *i.e.*, outside a party's legal rights.'" *Zuckerman* v. *Metro. Museum of Art*, 307 F. Supp. 3d 304, 318 (S.D.N.Y. 2018) (quoting *Interpharm, Inc.* v. *Wells Fargo Bank, Nat'l Ass'n*, 655 F.3d 136, 142 (2d Cir. 2011)).

Additionally, "[a] party claiming duress must act promptly to repudiate the contract at issue or that party will be deemed to have waived its right to do so." *Music Royalty Consulting, Inc.* v. *Reservoir Media Mgmt., Inc.*, No. 18 Civ. 9480 (CM), 2022 WL 1137137, at *16 (S.D.N.Y. Apr. 18, 2022); *accord DiRose* v. *PK Mgmt. Corp.*, 691 F.2d 628, 633-34 (2d Cir. 1982) (collecting cases). Thus, "[a] party ratifies a contract entered into under duress 'by remaining silent or acquiescing in the contract for a period of time after he has the opportunity to avoid it, or by acting upon it, performing under it, or affirmatively acknowledging it.'" *Music Royalty Consulting, Inc.*, 2022 WL 1137137, at *16  (quoting *Twenty Miljam-350 IED Jammers*, 669 F.3d at 89). Ratification is possible because the existence of duress generally makes a

contract *voidable*, rather than void, under New York law.  *See Twenty Miljam-350 IED Jammers*, 669 F.3d at 89.

Plaintiff's attempt to invoke the defense of duress fails for several reasons.  *First*, Plaintiff does not allege the existence of a wrongful threat.  *See Twenty Miljam-350 IED Jammers*, 669 F.3d at 88.  Plaintiff mentions an "uneasy feeling" she experienced while negotiating with Defendants about the Settlement Agreement, as well as her view that she had "no other choice but to sign" the Agreement due to her "desperate" need for assistance.  (Am. Compl. 10 ¶ 29).  Plaintiff also states that she felt pressured to sign the Settlement Agreement due to Defendants' unwillingness to meet with her in person to discuss her grievances.  (*Id.* at 10 ¶ 31 ("The Plaintiff was under Severe Duress and felt there was no other choice but to sign the contract, as all her efforts for more than seven months had been ignored by all Goldman Sachs Lawyers!")).  Lastly, Plaintiff discusses Defendants' "harassment with early morning, Saturday mail deliveries of Certified Letters, requiring a signature" as a relevant consideration in her ultimate decision to sign the Agreement.  (*Id.* at 9-10 ¶ 28).

Though these pleadings may depict Plaintiff's general sentiment of unease and anxiety, they do not identify a wrongful threat made by Defendants.  *See Goonewardena* v. *Forster & Garbus LLP*, No. 18 Civ. 29 (MKB), 2019 WL 121677, at *8 (E.D.N.Y. Jan. 7, 2019) ("Plaintiff alleges that he entered into the settlement agreements under duress, but he fails to allege how or what forced him to enter into the agreements, identify the alleged wrongful

threat, or explain how the alleged threat prevented the exercise of his free will."); *cf. Mandavia* v. *Columbia Univ.*, 912 F. Supp. 2d 119, 129 (S.D.N.Y. 2012) ("Plaintiff invokes the magical word 'duress,' but in doing so he merely states a legal conclusion unsupported by enough facts to cross the line into the realm of the plausible.").  Neither Defendants' alleged evasion of Plaintiff's requests to meet nor their weekend communications can be fairly described as sufficiently threatening to rise to the level of duress.  *See Mandavia*, 912 F. Supp. 2d at 128 ("Columbia's refusal to schedule meetings, disinterest in hearing his grievances, and generally hostile attitude in negotiations simply do not constitute wrongful threats sufficient to override a person's free will.").  The Court cannot interpret any representation made by Defendants during the course of the parties' negotiations as a "wrongful threat" within the meaning of the phrase, even according a liberal reading to Plaintiff's allegations.

Although Plaintiff does allege a $75,000 lump-sum-payment demand by her servicer, SPS, and a related threat of foreclosure (Am. Compl. 6 ¶ 11, 7 ¶ 17), neither allegation renders plausible Plaintiff's allegation that the Settlement Agreement is tainted by duress.  For starters, the allegations are contradicted by Plaintiff's own statements and attachments to her Amended Complaint.  SPS was not a "New Mortgage Servicer[,]" as Plaintiff claims — the November 2019 notice explicitly states that only ownership of the loan changed, not SPS's servicing of it.  (Pl. Ex. 8).  Further, SPS, as servicer of the loan, was a separate entity from Defendants, and it is unclear why SPS's alleged threat would be attributed to Defendants.  Finally, courts within this

Circuit have noted that foreclosure threats made pursuant to a loan contract are not "wrongful." *See, e.g.*, *Comind Participacoes, S.A.* v. *Terry*, No. 91 Civ. 3803 (KMW), 1996 WL 651097, at *5 (S.D.N.Y. Nov. 7, 1996) ("Terry also alleges that he signed the assignments under the duress of Comind's threats to foreclose on the aircraft mortgages … the 'threat' allegedly made by Comind was not unlawful."); *see also Grand Income Tax, Inc.* v. *HSBC Taxpayer Fin. Servs., Inc.*, No. 08 Civ. 346 (CBA), 2008 WL 5113646, at *6 (E.D.N.Y. Nov. 25, 2008) (noting that "the threat to exercise a legal or contractual right that the maker of the threat clearly holds, without more, is not generally considered improper," and citing authority for the proposition that "threats of loan foreclosure and default [do] not constitute duress" (internal quotations omitted)).

Even if the Court were to read Plaintiff's anxiety in relation to the Settlement Agreement negotiations as a sign that Defendants had made a "wrongful threat," Plaintiff's pleadings do not link such a threat to a preclusion of her ability to exercise free will, another necessary element of duress. Plaintiff does allege that she felt that she had "no other choice" but to sign the Settlement Agreement. (Am. Compl. 10 ¶ 29). But beyond merely asserting that she felt that she lacked other options, Plaintiff fails to put forward allegations suggesting that she in fact believed she had no choice but to sign the Settlement Agreement. Indeed, nothing in the Amended Complaint

suggests that her mortgage issues required immediate resolution.[8]  And Plaintiff's post-notice conduct does not suggest that she was operating as if the foreclosure threat precluded her exercise of free will, as discussed below.

Plaintiff's claim of duress is further belied by the allegations she makes regarding her own conduct during the drafting of the Settlement Agreement. Plaintiff states that she made "many edits" to the Settlement Agreement during the negotiation process, as she and Morreale exchanged proposed revisions to the Agreement.  (Am. Compl. 9-10 ¶ 28).  Plaintiff also recalls that Morreale added a few "key paragraphs" to the Agreement specifically to assuage concerns that she had expressed to him.  (*Id.*).  This equal-opportunity negotiation process does not suggest that Plaintiff was experiencing a lack of agency in the drafting of the Settlement Agreement, especially given Plaintiff's acknowledged familiarity with financial information and institutions.  (*Id.* at 2 ¶ 2, 10 ¶ 28).  Thus, even liberally construing Plaintiff's allegations, the Court cannot conclude that (i) a wrongful threat existed; or (ii) even if it did, Plaintiff lacked the ability to exercise agency.  The Court therefore rejects Plaintiff's argument that the Settlement Agreement is voidable based on duress.

---

[8]      This remains true even as to SPS's alleged foreclosure threat.  Plaintiff avers that the foreclosure threat was made alongside the notice in November 2019.  But Plaintiff did not sign the Settlement Agreement until mid-January 2020; thus, two months elapsed between the alleged threat and the contract Plaintiff now seeks to void.  (Pl. Ex. 14).

## 2. **Plaintiff Has Not Alleged Fraudulent Inducement**[9]

The Court turns next to Plaintiff's assertion that she was fraudulently induced into signing the Settlement Agreement. At several points in the Amended Complaint and in her opposition, Plaintiff catalogues potential misrepresentations made by Goldman Sachs that, she claims, induced her into signing the Settlement Agreement. For example, Plaintiff states that, in the run-up to her execution of the Agreement, Morreale "led [her] to believe" that her mortgage statements would be corrected upon her signature. (Am. Compl. 12 ¶ 37). In the Amended Complaint, Plaintiff appears to allege both that (i) Goldman Sachs induced her to sign the Settlement Agreement by falsely promising her that her concerns regarding her mortgage statements would be resolved, and (ii) this promise was in fact reflected in the Settlement Agreement that she signed. (*Compare* Am. Compl. 12 ¶ 37 (alleging that Goldman Sachs "led the Plaintiff to believe that by signing the Settlement ... that Goldman Sachs would ... demand the Mortgage Statements be corrected"), *with id.* at 13 ¶ 38 (noting the intent of the Settlement Agreement was to correct the mortgage statements)).

---

[9]     Though Plaintiff does not specifically use the terminology of "fraudulent inducement" as a basis for voiding the Settlement Agreement in her Amended Complaint, the Court will nevertheless consider the argument, given Plaintiff's status as a *pro se* litigant. As stated earlier, the Court must interpret Plaintiff's allegations to raise the strongest arguments they may suggest. *See Cruz* v. *Gomez*, 202 F.3d 593, 597 (2d Cir. 2000) (citing *Graham* v. *Henderson*, 89 F.3d 75, 79 (2d Cir. 1996)). Additionally, Plaintiff does argue the existence of "fraud" in relation to the Settlement Agreement in her opposition briefing. (Pl. Opp. 8). *See Vlad-Berindan* v. *MTA N.Y.C. Transit*, No. 14 Civ. 675 (RJS), 2014 WL 6982929, at *6 (S.D.N.Y. Dec. 10, 2014) ("In evaluating the legal sufficiency of a *pro se* plaintiff's claims, a court may [also] rely on the plaintiff's opposition papers" to the extent they are consistent with the operative pleading. (collecting cases)).

"'A party has made out a claim of fraudulent inducement if [the party] has pled [i] a material misrepresentation of a presently existing or past fact; [ii] an intent to deceive; [iii] reasonable reliance on the misrepresentation …; and [iv] resulting damages.'" *Goonewardena*, 2019 WL 121677, at *6 (*quoting Ipcon Collections LLC* v. *Costco Wholesale Corp.*, 698 F.3d 58, 62 (2d Cir. 2012)). "Fraudulent inducement claims are subject to the heightened pleading requirement of Rule 9(b) of the Federal Rules of Civil Procedure," which mandates that parties state with "particularity the circumstances constituting fraud or mistake." *Id.* at *7 (quoting *United States ex rel. Ladas* v. *Exelis, Inc.*, 824 F.3d 16, 25 (2d Cir. 2016) (internal quotation marks omitted)). Even when a plaintiff proceeds *pro se*, courts apply the Rule 9(b) pleading standard and dismiss complaints that do not meet its heightened requirements. *See, e.g.*, *Goonewardena*, 2019 WL 121677, at *8 (dismissing a *pro se* plaintiff's claim of fraud that the court deemed as conclusory and that also failed to satisfy Rule 9(b)); *accord Edmond* v. *Live Well Fin.*, *Inc.*, No. 19 Civ. 703 (VEC) (SN), 2020 WL 64747, at *1 (S.D.N.Y. Jan. 6, 2020); *Tasaka* v. *Bayview Loan Servicing, LLC.*, No. 17 Civ. 7235 (LDH) (ST), 2022 WL 992472, at *7 (E.D.N.Y. Mar. 31, 2022).

As the Second Circuit has clarified, "Rule 9(b) places two further burdens [beyond Rule 8] on fraud plaintiffs — the first goes to the pleading of the circumstances of the fraud, the second to the pleading of the defendant's mental state." *Loreley Fin. (Jersey) No. 3 Ltd.* v. *Wells Fargo Sec., LLC*, 797 F.3d 160, 171 (2d Cir. 2015). With respect to this first burden, a plaintiff must

"[i] detail the statements (or omissions) that the plaintiff contends are fraudulent, [ii] identify the speaker, [iii] state where and when the statements (or omissions) were made, and [iv] explain why the statements (or omissions) are fraudulent." *Id.* (quoting *Eternity Glob. Master Fund Ltd.* v. *Morgan Guar. Tr. Co. of N.Y.*, 375 F.3d 168, 187 (2d Cir. 2004) (internal quotation marks omitted)). "In other words, Rule 9(b) requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud." *United States ex rel. Polansky* v. *Pfizer, Inc.*, No. 04 Civ. 704 (ERK), 2009 WL 1456582, at *4 (E.D.N.Y. May 22, 2009) (internal quotations omitted).

With respect to the second burden imposed by Rule 9(b), "a fraud claim must be supported by allegations 'that give rise to a strong inference of fraudulent intent.'" *PetEdge, Inc.* v. *Garg*, 234 F. Supp. 3d 477, 491 (S.D.N.Y. 2017) (quoting *S.Q.K.F.C., Inc.* v. *Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996)). A plaintiff can meet this standard by "[i] alleging facts to show that [the] defendant[ ] had both motive and opportunity to commit fraud, or by [ii] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*

To demonstrate motive and opportunity to commit fraud, "a plaintiff must allege that the defendant 'benefitted in some concrete and personal way from the purported fraud.'" *Goonewardena*, 2019 WL 121677, at *7 (quoting *ECA, Loc. 134 IBEW Joint Pension Tr. of Chi.* v. *JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009)). In the corporate context, "[m]otives that are generally possessed by most corporate directors and officers do not suffice; instead,

22

plaintiffs must assert a concrete and personal benefit to the individual defendants resulting from the fraud." *PetEdge, Inc.*, 234 F. Supp. 3d at 494-95 (internal quotation marks omitted).  "[T]his Circuit has held that a generalized motive that does not result in concrete benefits to the defendant is insufficient to plead scienter." *Stamelman* v. *Fleishman-Hillard, Inc.*, No. 02 Civ. 8318 (SAS), 2003 WL 21782645, at *6 (S.D.N.Y. July 31, 2003).  By contrast, "[t]o show 'strong circumstantial evidence of conscious misbehavior or recklessness,' a plaintiff must demonstrate 'at the least, conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *Goonewardena*, 2019 WL 121677, at *7 (quoting *Kalnit* v. *Eichler*, 264 F.3d 131, 142 (2d Cir. 2001)).

Notably, "'conclusory allegations of fraudulent inducement are insufficient to overcome a release's unambiguous language.'" *Consorcio Prodipe, S.A. de C.V.* v. *Vinci, S.A.*, 544 F. Supp. 2d 178, 189 (S.D.N.Y. 2008) (citing *N.Y.C. Sch. Constr. Auth.* v. *Koren-DiResta Constr. Co.*, 671 N.Y.S.2d 738 (1st Dep't 1998)).  It is also true that "[a]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a claim for breach of contract." *PetEdge, Inc.*, 234 F. Supp. 3d at 491 (quoting *Wall* v. *CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006) (internal quotations omitted)).  However, "New York law specifically recognizes causes of action for fraud in the inducement when the misrepresentation is collateral to the contract it

23

induced." *CSX Transp., Inc.*, 471 F.3d at 416.  In the contractual setting, if the promise in question were reflected in the contract, yet "insincere" when made, such insincerity can give rise only to a breach of contract claim; it is not "collateral or extraneous" as required to plead fraud.  *Mexican Hass Avocado Importers Ass'n* v. *Preston/Tully Grp. Inc.*, 838 F. Supp. 2d 89, 98 (E.D.N.Y. 2012) (citing *D.S. Am. (E.), Inc.* v. *Chromagrafx Imaging Sys., Inc.*, 873 F. Supp. 786, 798 (E.D.N.Y. 1995); *Caniglia* v. *Chi. Tribune-N.Y. Syndicate, Inc.*, 612 N.Y.S.2d 146, 147 (1st Dep't 1994); *Ross* v. *DeLorenzo*, 813 N.Y.S.2d 756, 760-61 (2d Dep't 2006); *Gosmile, Inc.* v. *Levine*, 915 N.Y.S.2d 521, 524-25 (1st Dep't 2010)).

Here, Plaintiff argues *both* that she was defrauded into signing an agreement that lacked a term she was promised, *and* that Defendants breached the contract by not performing that term.  That term is the correction of Plaintiff's mortgage balance.  At first blush, Plaintiff's fraudulent inducement claim would appear to be duplicative of her breach of contract claim.  However, as just noted, a "claim for fraudulent inducement is separate and distinct from a claim for breach of contract under New York law, and a plaintiff may plead both causes of action."  *Rosen* v. *Spanierman*, 894 F.2d 28, 35 (2d Cir. 1990).  Further, Rule 8(d)(3) of the Federal Rules of Civil Procedure allows a party to "state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  Because Plaintiff's complaint alleges that Defendants falsely promised they would take action on her mortgage concerns — and despite the incompatibility of this claim with her breach of

contract claim — the Court considers the argument that this promise was extraneous to the contract and induced her to sign away her legal claims in exchange for payment.

Plaintiff's fraudulent inducement claim still fails for the simple reason that she has failed to satisfy the heightened pleading standard of Rule 9(b). *First*, Plaintiff fails under the first prong of the Rule 9(b) analysis: setting forth her allegations with the requisite specificity. *See, e.g.*, *Consorcio Prodipe, S.A. de C.V.*, 544 F. Supp. 2d at 189; *Goonewardena*, 2019 WL 121677, at *6. In the Amended Complaint, the only apparent allegation of a "material misrepresentation" made by Defendants is that Morreale "led [Plaintiff] to believe" that GSMC would correct her mortgage statements upon her signing of the Settlement Agreement. (Am. Compl. 12 ¶ 37). However, Plaintiff does not allege with specificity what actual statement Morreale made that "led [her] to believe" that GSMC would correct her mortgage statements, nor does she state when or where such a statement was made. *See Goonewardena*, 2019 WL 121677, at *7 ("To satisfy [Rule 9(b)], a complaint alleging fraud must [i] specify the statements that the plaintiff contends were fraudulent, [ii] identify the speaker, [iii] state where and when the statements were made, and [iv] explain why the statements were fraudulent." (internal citations and quotation marks omitted)).

Plaintiff attempts to address this deficiency in her opposition brief, but these allegations are likewise insufficiently precise. Specifically, Plaintiff alleges that Goldman Sachs represented to her that the Settlement Agreement

"was in good faith as a means to resolve the serious loan issues[.]"  (Pl. Opp. 11 ¶ 23).  And she alleges that Morreale represented the same to her in phone conversations.  (*Id.* at 12 ¶ 24).  But Defendants rightly note that Plaintiff does not support her allegation by pointing to any specific statements made by Defendants during the parties' phone conversations or email exchanges.  (Def. Reply 5).  Ultimately, even *pro se* litigants are required to allege facts that "plausibly" support a claim for relief when liberally construed, and on the issue of fraudulent inducement, Plaintiff fails to do so.  *Faber*, 648 F.3d at 104.

*Second*, Plaintiff does not adequately allege (i) that Defendants had the motive and opportunity to commit fraud; or (ii) strong circumstantial evidence of conscious misbehavior or recklessness.  That is, Plaintiff fails to satisfy the second prong of the Rule 9(b) inquiry requiring allegations that give rise to a strong inference of fraudulent intent.  Plaintiff suggests that Defendants were motivated to get her to sign the Settlement Agreement to "buy time" to transfer Plaintiff's mortgage to U.S. Bank.  (Am. Compl. 27 ¶ 6.4; *see also id.* at 12 ¶ 35).  But Plaintiff never explains how Goldman Sachs concretely benefitted by "buying time" or how the Settlement Agreement would enable Goldman Sachs to transfer the mortgage.  *See, e.g.*, *Bigsby* v. *Barclays Cap. Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) ("The Amended Complaint speaks vaguely of the corporate entity itself ….  If a mere allegation of corporate profit were sufficient to allege scienter, the requirement would be effectively eliminated." (internal citation omitted)).  Indeed, Goldman Sachs appears to

26

have had every right to transfer the mortgage irrespective of the Settlement Agreement.

Further, Plaintiff contradicts herself in her own opposition, conceding that Defendants had already transferred Plaintiff's mortgage to the "U.S. Bank National Association Trust" before the parties entered into the Settlement Agreement.  (*See* Pl. Opp. 21 (noting that Goldman Sachs transferred the mortgage "[i]n or around January 1, 2020")).  Thus, Plaintiff's key theory as to Defendants' motive is belied by her own assertions.  *See, e.g.*, *Loreley*, 797 F.3d at 177 ("In determining whether this strength-of-inference requirement is met, [w]e consider the complaint in its entirety and take into account plausible opposing inferences.").

Finally, Plaintiff's passing references to vague statements made by Goldman Sachs do not provide the type of strong circumstantial evidence required to prove Defendants were acting recklessly or consciously misbehaving.  Again, Plaintiff relies on one principal theory of Defendants' intent, but that theory is inadequately pleaded and fatally undermined by other allegations in the Amended Complaint.

### 3.    Defendants Did Not Breach the Settlement Agreement

In Count 4 of her Amended Complaint, Plaintiff contends that Defendants breached the Settlement Agreement by not correcting her mortgage statements.  (Am. Compl. 15-18).  More specifically, Plaintiff alleges that Defendants breached two provisions of the Settlement Agreement: Section 8 (the "Warranties and Representations" provision) and Section 13 (the "Further

27

Assurances" provision).  (*Id.* at 17).  In response, Defendants argue that they had "no express obligations" as part of the Settlement Agreement aside from issuing the $2,500 payment to Plaintiff.  (Def. Br. 13).  According to Defendants, "[n]owhere in the Settlement Agreement is there any obligation on, or undertaking by, GSMC to cure any alleged mortgage servicing issues or otherwise take any other express affirmative action other than payment of the settlement amount."  (*Id.*).  Defendants further argue that Plaintiff places undue reliance on Sections 8 and 13 of the Settlement Agreement.  (*Id.*).  According to Defendants, Section 8 is a standard contractual clause that assures that Plaintiff had not assigned the rights that she was releasing in the Settlement Agreement; only Plaintiff had made such a representation in the Agreement because only she was agreeing to release claims.  (*Id.*).  Defendants contend that Section 13 is similarly a standard clause that requires parties to fulfill their express obligations set forth by the Agreement.  (*Id.*).

"To make out a breach of contract claim, a plaintiff must plead '[i] the existence of an agreement, [ii] adequate performance of the contract by the plaintiff, [iii] breach of contract by the defendant, and [iv] damages.'"  *Milligan* v. *GEICO Ins. Co.*, No. 20-3726, 2022 WL 433289, at *2 (2d Cir. Feb. 14, 2022) (summary order) (quoting *Harsco Corp.* v. *Segui*, 91 F.3d 337, 348 (2d Cir. 1996)).  Importantly, a plaintiff must "identify the specific provisions of a contract" that it alleges a defendant breached.  *(RC) 2 Pharma Connect, LLC* v. *Mission Pharmacal Co.*, No. 21 Civ. 11096 (LJL), 2022 WL 2441046, at *7 (S.D.N.Y. July 5, 2022).

Furthermore, "[u]nder New York law, a party's performance under a contract is excused where the other party has substantially failed to perform its side of the bargain or, synonymously, where that party has committed a material breach." *Process Am., Inc.* v. *Cynergy Holdings, LLC*, 839 F.3d 125, 136 (2d Cir. 2016). "It is clear … that the materiality of any particular breach is a question of fact under New York law." *Deutsche Bank Nat'l Tr. Co. for Morgan Stanley Structured Tr. I 2007-1* v. *Morgan Stanley Mortg. Cap. Holdings LLC*, 289 F. Supp. 3d 484, 513 (S.D.N.Y. 2018) (citing *Orlander* v. *Staples, Inc.*, 802 F.3d 289, 298 (2d Cir. 2015)).

Even construing her allegations liberally, Plaintiff has not adequately pleaded that Defendants breached the Settlement Agreement. *First*, Plaintiff's claim that Defendants breached the Agreement by failing to correct her mortgage statements is premised on an obligation to which Defendants did not explicitly agree when they signed the Settlement Agreement. The Settlement Agreement makes no mention of any alteration of Plaintiff's mortgage statements. (Def. Br. 13). And while Plaintiff contends that she was "led … to believe" that such an alteration would occur (Am. Compl. 12 ¶ 37), the Court does not find this allegation to be plausible, given Plaintiff's noteworthy lack of specificity regarding this alleged misrepresentation. For the purposes of an action on the Settlement Agreement itself, the Court also agrees with Defendants that correcting the mortgage statements would constitute a material obligation, and it is therefore unlikely that either party would sign a Settlement Agreement that did not make explicit reference to such an

obligation.  (Def. Reply 7 ("It remains utterly implausible that GSMC … would incur the cost of preparing a fraudulent settlement agreement that omits the material obligations, make the agreed settlement payment, and expose itself to liability from the purchaser of the mortgage loan for no apparent benefit.")).

More fundamentally, the Court is unwilling to infer such a duty from the Settlement Agreement when its explicit terms — including the payment of $2,500 to Plaintiff and Plaintiff's release of all potential claims against GSMC — are clear and unambiguous.  *See Fisher* v. *SD Prot. Inc.*, 948 F.3d 593, 606 (2d Cir. 2020) ("If the terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." (internal quotation marks omitted)).  What is more, the Settlement Agreement contains an "Integration Clause," which makes clear that the contract "contains the entire agreement between and among the Parties, and supersedes all prior and contemporaneous discussions, negotiations, and understandings and agreements, whether oral or written, express or implied, between or among them relating to the subject matter of this agreement."  (Pl. Ex. 14 ¶ 15).  When such a clause exists, and the parties' obligations appear clear and unambiguous on a contract's face, the Court will not read in additional, unstated obligations, including Defendants' alleged obligation to correct Plaintiff's mortgage statements.  Plaintiff thus fails to demonstrate the "existence of an agreement," a key element in establishing a *prima facie* case for breach of contract.  *See Milligan*, 2022 WL 433289, at *2.

Plaintiff argues that the Settlement Agreement should be construed in accordance with the parties' intent, and that her intent in signing the Agreement was to get her mortgage statements corrected.  (Pl. Opp. 12 ¶ 26). She claims that the $2,500 was paid by Defendants in "good faith" as a "Consulting fee" to compensate her for "the many hours she spent" on compiling her financial documents and engaging in conversations with Defendants.  (*Id.* at 12 ¶¶ 26-28).  Though Plaintiff is correct that the Court should interpret the contract pursuant to the parties' intent, the Court's reading of the parties' intent "derive[s] from the contracts' unambiguous terms."  *Hoover* v. *HSBC Mortg. Corp. (USA)*, 9 F. Supp. 3d 223, 241 (N.D.N.Y. 2014).  Where, as here, "the terms of a written contract are clear and unambiguous, the intent of the parties must be found within the four corners of the contract."  *Matter of Wachovia Bank Com. Mortg. Tr.*, 375 F. Supp. 3d 441, 448 (S.D.N.Y. 2019) (quoting *Howard* v. *Howard*, 740 N.Y.S.2d 71, 71 (2d Dep't 2002) (internal quotation marks omitted)).  The Court therefore cannot credit Plaintiff's assertions in her opposition brief that her intent was to have her mortgage statements corrected when evidence of such an intent cannot be found within the four corners of the Agreement.

*Second*, Plaintiff has not alleged Defendants' breach of either of Sections 8 or 13 of the Settlement Agreement.  As to Section 8, Plaintiff suggests that the limitations on assignments and transfers discussed in that section meant that Defendants breached the contract when Defendants transferred the mortgage.  (Pl. Opp. 6 ¶ 12).  As to Section 13, Plaintiff alleges that Defendants

failed to "give reasonable cooperation" as required by that section because they did not correct her mortgage statements. (*Id.* at 9 ¶ 17). But, as Defendants correctly assert, Sections 8 and 13 are merely standard contract provisions designed to ensure that both parties obtain the full benefit of their mutual promises. (Def. Br. 13-14). Plaintiff's Section 8 argument is premised on a misreading of the provision, which requires only that the parties have not "assigned, transferred, [or] conveyed … any right, claim, [or] action … *subject to the releases set forth in this Agreement.*" (Pl. Opp. 5 (emphasis added)). In truth, Goldman Sachs could not have violated Section 8, as it was not releasing any claims against Plaintiff, and, accordingly, was not precluded from assigning away particular rights. (Def. Br. 13). Section 13, by contrast, requires only that the parties take reasonable action to execute their obligations under the Agreement, which Defendants did by submitting the $2,500 payment to Plaintiff. (*Id.* at 13-14). "Standard Further Assurances provisions," such as Section 13, "do not create novel obligations for parties." *In re: Ampal-Am. Isr. Corp.* v. *Merhav Ampal Grp., Ltd.*, No. 15 Civ. 7949 (JSR), 2016 WL 859352, at *4 (S.D.N.Y. Feb. 28, 2016); *see also 97th St. Holdings, LLC* v. *E. Side Tenants Corp.*, 918 N.Y.S.2d 421, 422 (1st Dep't 2011) ("[t]o impute such obligations from generalized language found in the contract's further assurances clause … would amount to a reformation of the contract without basis"). There is, in short, no viable breach of contract claim that can be predicated on the Settlement Agreement.

**C.      Plaintiff's Pre-Settlement Claims Fail**

Separate and apart from her contractual claims, Plaintiff also alleges

claims based on Defendants' pre- and post-Agreement conduct.  The former

category, which the Court addresses now, includes claims for (i) violation of the

Truth in Lending Act ("TILA"), 15 U.S.C. § 1601-1667f (Am. Compl. 14);

(ii) violation of TILA's implementing regulation, 12 C.F.R. § 1026.39 (*id.* at 14-

15); (iii) violation of 12 U.S.C. § 2605, a statutory provision that pertains to the

"[s]ervicing of mortgage loans and administration of escrow accounts" (*id.* at

15); (iv) negligence, premised on Defendants' alleged failure to investigate and

redress Plaintiff's mortgage statements (*id.* at 19); (v) mortgage fraud (*id.* at 19-

20); and (vi) breach of fiduciary duty, premised on substantially similar

allegations as Plaintiff's negligence claim (*id.* at 20-21).  Because these claims

pre-date execution of the Settlement Agreement, the Court refers to them as

the "pre-settlement claims."  Defendants move to dismiss all of these claims,

arguing both release (Def. Br. 8-9), and failure to state a claim (*id.* at 10-13, 16,

19).  For the reasons discussed below, the Court agrees with Defendants as to

both points, and accordingly dismisses Plaintiff's pre-settlement claims.

**1.      The Settlement Agreement Bars Plaintiff's Claims Based on
          Conduct Pre-Dating the Settlement**

Plaintiff signed the Settlement Agreement on January 15, 2020, which is

listed by the Agreement as its "Effective Date."  (Pl. Ex. 14).  As noted above,

the Settlement Agreement is a valid and enforceable contract.  The Agreement

operates as a release of claims "from the beginning of time up until, and

through, the Effective Date[.]"  (Pl. Ex. 14 ¶ 3).  Accordingly, Plaintiff's pre-

settlement claims — which are based on facts predating the Effective Date (*i.e.*, January 15, 2020) — are barred by Section 3 of the Settlement Agreement. Beyond disputing the validity and enforceability of the Settlement Agreement or arguing about its scope, Plaintiff does not in fact dispute that these claims would be released by its terms.  And because the Court has already ruled against Plaintiff on these antecedent arguments about enforceability and scope, the terms of the Agreement preclude her pre-settlement claims.

### 2.    Plaintiff's Pre-Settlement Claims Are Inadequately Pleaded

In addition to being barred by the release provision of the Settlement Agreement, Plaintiff's pre-settlement claims are also inadequately pleaded, and fail for this independent reason.

### a.    Plaintiff Fails to State a Claim for a Violation of 15 U.S.C. § 1641

In Count 1 of her Amended Complaint, Plaintiff contends that Defendants violated 15 U.S.C. § 1641(a)-(d) and (g).  (Am. Compl. 14).  This TILA provision, among other functions, requires that creditors make certain disclosures to borrowers pertaining to loan transfers.  Plaintiff claims that the required notice given to her was "at least six months late" and that it "contained significant inaccuracies … and stated incorrect information about who the previous Servicer was with a typo in the line," in addition to showing a "sudden increase to the outstanding Mortgage Princip[al] amount."  (*Id.*). Though Plaintiff does not explicitly state which notice she is referring to in Count 1 of her Amended Complaint, the only notice identified in her pleadings is the one dated November 22, 2019, which informed her of the transfer of

ownership of her loan.  (Pl. Ex. 8).  Defendants argue that among the TILA

provisions cited by Plaintiff, only Section 1641(g) creates any sort of obligation

related to disclosures to borrowers, and further argue that any claim by

Plaintiff under this section is time-barred.  (Def. Br. 10-12).  The Court agrees

with Defendants that Plaintiff's only arguably viable claim under the statute,

based on Section 1641(g), is time-barred.

To begin, Defendants correctly assert that Sections 1641(a)-(d) do not

provide independent causes of action.  (Def. Br. 10).  Section 1641(a) sets forth

"prerequisites" for a party's ability to sue under Section 1641, while Section

1641(b) explains what suffices as "proof of compliance" with the statute's

provisions.  15 U.S.C. § 1641(a)-(b).  Sections 1641(c) and 1641(d) describe

certain rights maintained by relevant parties.  *Id.* § 1641(c)-(d).  That said,

Section 1641(g), in conjunction with 15 U.S.C. § 1640(a), does provide a private

right of action.  Section 1641(g) reads: "not later than 30 days after the date on

which a mortgage loan is sold or otherwise transferred or assigned to a third

party, the creditor that is the new owner or assignee of the debt shall notify the

borrower in writing of such transfer," and lists several pieces of relevant

information to include, such as the identity of the new creditor and how to

reach a representative of the new creditor.  *Id.* § 1641(g).  Section 1640(a)

authorizes suits for damages for violations of Section 1641(g).

Still, the Court cannot consider any of Plaintiff's claims under Section

1641, as they are time-barred.  Claims brought under TILA must be brought

"within one year from the date of the occurrence of the violation."  15 U.S.C.

§ 1640(e); *see also Latouche* v. *Wells Fargo Home Mortg. Inc.*, 752 F. App'x 11, 12-13 (2d Cir. 2018) (summary order) ("Private actions based on violations of TILA must be brought 'within one year from the date of the occurrence of the violation.'" (quoting 15 U.S.C. § 1640(e)); *Gonzalez* v. *J.P. Morgan Chase Bank, N.A.*, 228 F. Supp. 3d 277, 291 (S.D.N.Y. 2017) (same, in context of a *pro se* complaint). As Defendants correctly assert, the ownership of Plaintiff's mortgage was transferred on October 31, 2019. (Def. Br. 11; Pl. Ex. 8). The notice included in Plaintiff's pleadings is dated November 22, 2019, and Plaintiff admits that she received the notice on November 25, 2019. (Pl. Ex. 8). Yet Plaintiff waited until May 2021 to file her action. (Def. Br. 11; Dkt. #1). In short, the statute of limitations on Plaintiff's Section 1641 claims had already expired by the time Plaintiff filed this action.

Although Plaintiff does not address Defendants' arguments on this point, the Court *sua sponte* considers whether the statute of limitations should be equitably tolled and concludes in the negative. "Equitable tolling is available in rare and exceptional circumstances, where the court finds that extraordinary circumstances prevented the party from timely performing a required act, and that the party acted with reasonable diligence throughout the period he sought to toll." *Gonzalez*, 228 F. Supp. 3d at 291 (quoting *Grimes* v. *Fremont Gen. Corp.*, 785 F. Supp. 2d 269, 286 (S.D.N.Y. 2011) (internal quotation marks omitted)). As potentially relevant here,

> [a] statute of limitations may be tolled due to the defendant's fraudulent concealment if the plaintiff establishes that: [i] the defendant wrongfully concealed

36

material facts relating to defendant's wrongdoing;
[ii] the concealment prevented plaintiff's discovery of the
nature of the claim within the limitations period; and
[iii] plaintiff exercised due diligence in pursuing the
discovery of the claim during the period plaintiff seeks
to have tolled.

*Id.* (quoting *Corcoran* v. *N.Y. Power Auth.*, 202 F.3d 530, 543 (2d Cir. 1999)

(internal quotation marks omitted)).  Moreover, the application of equitable

tolling requires "fraudulent conduct *beyond the nondisclosure itself.*"  *Id.*

(internal citation and quotation marks omitted) (emphasis in original).  Here,

no "extraordinary circumstances" exist that would warrant the application of

equitable tolling, as Plaintiff alleges no facts to demonstrate that she was

precluded from discovering the nature of the claim due to Defendants'

concealment.  *See Gonzalez*, 228 F. Supp. 3d at 292 ("There are no plausible

allegations that any acts by the defendants prevented the plaintiff from

accessing the courts to vindicate his rights.").  The Court accordingly dismisses

Count 1 of Plaintiff's Amended Complaint.

> **b.    Plaintiff Fails to State a Claim for a Violation of 12
> C.F.R. § 1026.39**

Plaintiff next alleges that Defendants are in violation of 12 C.F.R.

§ 1026.39.  She generally reiterates the allegations she makes in support of her

TILA claim, including allegations that the notice she received was "six months

late" and did not accurately state the "name and address of the previous

Mortgage Owner and Covered person."  (Am. Compl. 15).  Defendants point out

that 12 C.F.R. § 1026.39 operates as an "implementing regulation" for 15

U.S.C. § 1641(g), and thus does not affect the time-bar issue.  (Def. Br. 12).

37

*See also Wright* v. *Green Tree Servicing LLC*, No. 14 Civ. 8493 (ALC), 2016 WL 4098404, at *3 (S.D.N.Y. July 25, 2016) (describing plaintiff's claims under TILA and "its implementing regulation, 12 C.F.R. § 1026.39"), *aff'd*, 685 F. App'x 67 (2d Cir. 2017) (summary order); *Rowe* v. *Cenlar FSB*, No. 19 Civ. 7278 (JMA) (AYS), 2021 WL 6065746, at *2 (E.D.N.Y. Dec. 22, 2021) (citing 12 C.F.R. § 1026.39(a)(1), (b) and describing the provision as the "regulatory vehicle through which TILA is implemented" (internal citation and quotation marks omitted)). There is no private right of action under the implementing regulation separate and apart from the statute; instead, the regulation offers a clarifying interpretation "promulgated through notice-and-comment rulemaking[.]" *Wright*, 2016 WL 4098404, at *3. Thus, even if Plaintiff could mount a claim under 12 C.F.R. § 1026.39, it would be time-barred due to the one-year statute of limitations for TILA actions, and the Court dismisses Count 2 of the Amended Complaint.[10]

### c.   Plaintiff Fails to State a Claim for a Violation of 12 U.S.C. § 2605

The Court next addresses Plaintiff's claim in Count 3 that Defendants violated 12 U.S.C. § 2605. That statute pertains to the "[s]ervicing of mortgage loans and administration of escrow accounts[,]" and lists several relevant notice

---

[10]   Defendants also argue that GSMC is not a "covered person" as articulated by 12 C.F.R. § 1026.39 because it "did not 'become the owner of an existing mortgage loan.'" (Def. Br. 12 (quoting 12 C.F.R. § 1026.39)). However, this statement appears at odds with Defendants' claim that "GSMC owned Plaintiff's mortgage loan between April and October 2019." (*Id.* at 3). The Court will not resolve this discrepancy on this motion, as Count 2 is dismissed for being time-barred irrespective of whether GSMC qualifies as a "covered person" under Section 1026.39.

and disclosure requirements that servicers must make to borrowers.  12 U.S.C. § 2605.  In connection with this claim, Plaintiff contends that Defendants maintain "control and influence" on Wall Street such that they should have been able to "demand" the correction of Plaintiff's mortgage statements.  (Am. Compl. 15).  Defendants deny that this statute applies to them in the first instance, given they are not mortgage servicers.  They are correct, and Plaintiff fails to state a claim under 12 U.S.C. § 2605.  As just noted, the provision relates to the servicing of mortgage loans and administration of escrow accounts.  *See* 12 U.S.C. § 2605.  Here, however, Plaintiff has not alleged that either GSMC or MTGLQ was the servicer of her mortgage loan at any point. (Def. Br. 13).  Accordingly, even if GSMC or MTGLQ did own Plaintiff's loan for some period of time, neither was the loan's servicer; consequently, neither is subject to liability under 12 U.S.C. § 2605.  The Court dismisses this claim.

### d.    Plaintiff Fails to State a Claim for Negligence

In Count 5 of her Amended Complaint, Plaintiff alleges that Defendants are negligent for failing to satisfy a duty that they owed to her.  (Am. Compl. 19).  Specifically, Plaintiff claims that Karen Seymour, former General Counsel of Goldman Sachs, breached the "fiduciary duty" she owed to Plaintiff, a Goldman Sachs customer, by refusing to review Plaintiff's documentary evidence of alleged mortgage fraud.  (*Id.*).[11]  Plaintiff alleges that, instead of

---

[11]    To review, Plaintiff alleges that she scheduled a meeting with Ms. Seymour, at which Ms. Seymour failed to appear, in December 2019.  (Am. Compl. 6 ¶ 12).  Plaintiff also sent an email to Ms. Seymour and Goldman Sachs's CEO, David Solomon, on December 16, 2019.  (*Id.* at 7 ¶ 14).

reviewing Plaintiff's account, Seymour "threatened" her "through the SPS lawyer Mr. Mitchell Scott Kurtz[.]" (*Id.*; *see also id.* at 7 ¶ 17 ("[T]here can be no valid, ethical reason that Ms. Seymour, as General Counsel, has ignored Mortgage Fraud Allegations by a Customer[.]")).

"To establish a *prima facie* case of negligence under New York law, three elements must be demonstrated: [i] the defendant owed the plaintiff a cognizable duty of care as a matter of law; [ii] the defendant breached that duty; and [iii] plaintiff suffered damage as a proximate result of that breach." *Curley* v. *AMR Corp.*, 153 F.3d 5, 13 (2d Cir. 1998) (citations omitted). With particular respect to the "duty of care" element, Plaintiff's argument appears to presuppose that Defendants' officers are obliged to meet with any customer who believes she has been the victim of fraud. (Am. Compl. 19). Alternatively, Plaintiff claims that Seymour herself was required to open an investigation into her claims of fraud. (*Id.*). However, the Court cannot find support for the notion that such duties exist for senior bank officers like Seymour. Though banks "do owe a general duty of care to their customers to conduct business reasonably," *Gorham-DiMaggio* v. *Countrywide Home Loans, Inc.*, 592 F. Supp. 2d 283, 298 (N.D.N.Y. 2008), *aff'd*, 421 F. App'x 97 (2d Cir. 2011) (summary order), this cannot logically extend to require the General Counsel of Goldman Sachs to speak personally with all customers with concerns about their accounts. The Amended Complaint and Plaintiff's opposition are replete with facts suggesting that Goldman Sachs did, in fact, consider Plaintiff's concerns, even if Defendants' officers did not directly respond. (*See, e.g.*, Am. Compl. 7

¶ 15 (noting that Morreale "was following up on an email [Plaintiff] sent to Goldman Sachs Executives regarding Mortgage Loan concerns")).

Further, there is no evidence to suggest that Defendants would have a heightened duty of care that would encompass such a responsibility. *See Kirschner as Tr. of Millennium Lender Claim Tr.* v. *J.P. Morgan Case Bank, N.A.*, No. 17 Civ. 6334 (PGG) (SLC), 2020 WL 9815174, at *16 (S.D.N.Y. Dec. 1, 2020) ("'[G]enerally, banking relationships are not viewed as special relationships giving rise to a heightened duty of care.'" (quoting *Banque Arabe et Int'l D'Investissement* v. *Md. Nat'l Bank*, 57 F.3d 146, 158 (2d Cir. 1995))). The Court likewise agrees with Defendants that "[n]o contract, law or regulation" establishes the existence of a heightened duty of care encompassing the obligation described by Plaintiff. (Def. Br. 16).

Even if such a duty existed, Plaintiff fails to demonstrate the second element required to state a *prima facie* case for negligence: breach. Though Seymour did not meet with Plaintiff herself, Morreale, as counsel for Goldman Sachs, *did* speak with Plaintiff to address her concerns. (Am. Compl. 7 ¶ 15). Accordingly, since a representative of Goldman Sachs took reasonable care to review Plaintiff's claims, Defendants fulfilled their duty, assuming that such a duty existed. Plaintiff does not make any arguments as to why Seymour would have been the only individual at Goldman Sachs who could have completed this task. To the extent Plaintiff suggests that Defendants' duty encompasses resolution of Plaintiff's mortgage fraud concerns, it would be duplicative of a variety of Plaintiffs' other claims — including breach of contract — and would

thus not support an independent claim for negligence.  *See, e.g.*, *Clarendon Nat. Ins. Co.* v. *Health Plan Administrators*, No. 08 Civ. 6279 (GBD), 2009 WL 3053736, at *4 (S.D.N.Y. Sept. 24, 2009) (dismissing negligence claims because "the allegations supporting the negligence claim are duplicative of the alleged breach of contract claim"); *see also Fixed Income Shares: Series M* v. *Citibank N.A.*, 130 F. Supp. 3d 842, 857 (S.D.N.Y. 2015) (dismissing negligence claims premised on same "alleged deficiencies … that give rise to Plaintiffs' breach of contract claims").

### e.  Plaintiff Fails to State a Claim for Breach of Fiduciary Duty

In Count 7, Plaintiff claims that Defendants breached a fiduciary duty they owed to Plaintiff.  Plaintiff's claim rests on (i) Defendants' alleged hiring of SPS as a mortgage servicer in spite of its reputation for being "unethical" and (ii) Defendants' failure to respond effectively to Plaintiff's concerns about her "mortgage loan inaccuracies."  (Am. Compl. 20-22).  Defendants move to dismiss this claim on the basis that they do not have a fiduciary relationship with Plaintiff.  (Def. Br. 19).  The Court agrees.

Though the Court must credit Plaintiff's allegation that GSMC or MTGLQ owned her mortgage loan during some portion of the relevant time period, "it is 'well settled under New York law that a lender is not in a fiduciary relationship with a borrower, and thus a lender does not owe a borrower any special duties.'"  *Miyamoto* v. *Bank of America, N.A.*, No. 19 Civ. 445 (FB) (ST), 2020 WL 5577730, at *3 (E.D.N.Y. Sep. 17, 2020) (quoting *Abraham* v. *Am. Home Mortg. Servicing, Inc.*, 947 F. Supp. 2d 222, 236 (E.D.N.Y. 2013)); *see also Iannuzzi* v.

42

*Am. Mortg. Network, Inc.*, 727 F. Supp. 2d 125, 138 (E.D.N.Y. 2010) ("As a general matter, a lender is not a fiduciary of its borrower under New York law" (citation omitted)); *Barnett* v. *Countrywide Bank, FSB*, 60 F. Supp. 3d 379, 390-91 (E.D.N.Y. 2014).  Since Plaintiff fails to demonstrate that a fiduciary relationship exists with Defendants, she cannot state a claim for breach of fiduciary duty, and Count 7 must be dismissed.

### f.    Plaintiff Fails to State a Claim for Mortgage Fraud

Plaintiff contends in Count 6 of her Amended Complaint that Defendants have committed mortgage fraud.  To be clear, this claim of fraud arises not in the context of the Settlement Agreement, as to which Plaintiff has claimed fraudulent inducement, but rather in the context of Plaintiff's allegations that Defendants or her mortgage servicer artificially inflated her mortgage balance. This appears to be the core of Plaintiff's frustration with Defendants.  (Am. Compl. 19-20).  Plaintiff alleges that there were "significant ... inaccuracies" in the November notice, and suggests that Seymour and Solomon could not "explain nor justify" such inaccuracies.  (*Id.* at 20).  Further, Plaintiff claims that she called SPS on August 17, 2021, and spoke with "several employees" who told her that Goldman Sachs "issued a check for $42,808.09 and it was suddenly added to the Isenberg[s'] mortgage statement as if it was Escrow funding and demanding the Isenberg[s] pay."  (*Id.*).  According to Plaintiff, "[n]o one has produced a copy of the [$42,808.09] check[.]"  (*Id.*).  Plaintiff concludes by stating that "[m]ultiple account numbers combined with the extortion and coercion, gives rise to Money Laundering especially considering the significant

43

numerical inaccuracies whereby, The Interest[] Bearing Princip[al] Amount increased from $515,896.94 to $617,975.00." (*Id.*).  Defendants take issue with each of Plaintiff's allegations regarding instances of fraud.  (*See, e.g.*, Def. Reply 4-7).  But the thrust of Defendants' argument for dismissal of this claim is that Plaintiff has not satisfied the heightened pleading requirements of Rule 9(b), which requires claims of fraud be plead with particularity.  (*Id.* at 4; *see also* Def. Br. 17-18).  The Court again agrees.

"'Under New York law, to state a claim for fraud a plaintiff must demonstrate: [i] a misrepresentation or omission of material fact; [ii] which the defendant knew to be false; [iii] which the defendant made with the intention of inducing reliance; [iv] upon which the plaintiff reasonably relied; and [v] which caused injury to the plaintiff.'"  *Pipala* v. *JP Morgan Chase Bank NA*, No. 16 Civ. 3723 (VB), 2016 WL 7378979, at *2 (S.D.N.Y. Dec. 20, 2016) (quoting *Wynn* v. *AC Rochester*, 273 F.3d 153, 156 (2d Cir. 2001)).  As stated earlier, fraud claims are considered under "'Rule 9(b) [of the Federal Rules of Civil Procedure], [which] requires that a plaintiff set forth the who, what, when, where and how of the alleged fraud.'"  *Goonewardena*, 2019 WL 121677, at *7 (citation omitted).  Furthermore, "a fraud claim must be supported by allegations 'that give rise to a strong inference of fraudulent intent,'" and a plaintiff can meet this standard by "'[i] alleging facts to show that [the] defendant[] had both motive and opportunity to commit fraud, or by [ii] alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.'"  *PetEdge, Inc.*, 234 F. Supp. 3d at 491 (citation omitted).

Plaintiff's mortgage fraud claim is deficient for the same reasons previously discussed in the context of her fraudulent inducement claim. Plaintiff has not satisfied the heightened pleading standard of Rule 9(b): she has not "state[d] with particularity the circumstances constituting fraud[,]" nor has she adequately pleaded facts regarding scienter.  Fed. R. Civ. P. 9(b).  The Court will dismiss Count 6 of the Amended Complaint

## D.     Plaintiff's Post-Settlement Claims Fail

Plaintiff also brings several claims that derive from Defendants' post-settlement conduct (the "Post-Settlement Claims").  These claims include (i) breach of the Settlement Agreement; (ii) violation of New York General Business Law § 349, New York's consumer protection statute; and (iii) perjury, based on Morreale's statements at one of the Court's conferences.  For the reasons discussed below, the Court finds that the Post-Settlement Claims are inadequately stated and thus dismisses them.

### 1.     Plaintiff Fails to State a Claim for Breach of the Settlement Agreement

As discussed earlier in this Opinion, Plaintiff alleges in Count 4 of her Amended Complaint that Defendants breached the Settlement Agreement. Plaintiff claims that "[t]he Contract was written and signed in Bad Faith by the Defendants, deceiving [her], and leading her to believe Goldman Sachs was going to talk to the Mortgage Servicer and demand they correct the Mortgage Statements and stop harassing [her]."  (Am. Compl. 15).  Plaintiff also contends that Defendants breached Sections 8 and 13 of the Settlement Agreement specifically.  (*Id.* at 17).  For substantially the same reasons upon which the

Court found the Settlement Agreement to be valid and enforceable, *see supra* Discussion B, it rejects Plaintiff's claim for breach of contract.

### 2. Plaintiff Fails to State a Claim for a Violation of New York General Business Law § 349

In Count 8 of the Amended Complaint, Plaintiff contends that Defendants have violated New York General Business Law § 349. (Am. Compl. 22-23). Plaintiff describes Section 349 as a "broadly construed law designed to put consumers on the same footing as businesses," and alleges that Defendants used "deceptive business acts and practices in response to the mortgage fraud allegations" that she brought. (*Id.*). According to Plaintiff, Defendants' deceptive acts and practices prevented Plaintiff from receiving the "intended benefit[]" of the Settlement Agreement — namely, correcting her mortgage statements. (*Id.*). Separately, Plaintiff states that she experienced "severe emotional distress and significant financial damages" as a result of Defendants' "egregious" practices. (*Id.*). Defendants argue for dismissal of the claim for three reasons: (i) Section 349 requires plaintiffs to show that the conduct was consumer-oriented, and Plaintiff's mortgage issues were a private dispute; (ii) Plaintiff has not suffered injury; and (iii) the claim is barred as duplicative of Plaintiff's breach of contract claim. (Def. Br. 19-21). The Court agrees with Defendants as to their first and third arguments for dismissal.

Section 349(a) provides that "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful." N.Y. Gen. Bus. Law § 349. "'To maintain a cause of action under Section 349, a plaintiff must show: [i] that the

defendant's conduct is consumer-oriented; [ii] that the defendant is engaged in a deceptive act or practice; and [iii] that the plaintiff was injured by the practice.'" *Blockchain Luxembourg S.A.* v. *Paymium, SAS*, No. 18 Civ. 8612 (GBD), 2019 WL 4199902, at *11 (S.D.N.Y. Aug. 7, 2019) (quoting *Heskiaoff* v. *Sling Media, Inc.*, 719 F. App'x 28, 31 (2d Cir. 2017) (summary order)); *see also Wilson* v. *Nw. Mut. Ins. Co.*, 625 F.3d 54, 64 (2d Cir. 2010) (same).

Plaintiff fails to state a claim under Section 349 for two main reasons. *First*, Plaintiff does not adequately allege that Defendants' actions were consumer-oriented, as Plaintiff fails to explain why the conduct described would have had a "broad impact on the public at large." *Edebali* v. *Bankers Std. Ins. Co.*, No. 14 Civ. 7905 (JS), 2016 WL 5956007, at *3 (E.D.N.Y. Jan. 14, 2016). Here, even accepting as true Plaintiff's allegations about Defendants' deceptive actions, Plaintiff describes nothing "more than a private contractual dispute" relating to the Settlement Agreement. *Id.* Defendants state in their briefing that "[t]here can be nothing more private than a confidential settlement agreement between two parties relating to one mortgage loan." (Def. Br. 20). The Court agrees that Plaintiff's allegations describe an isolated dispute between two parties, not a widespread deceptive practice utilized and perpetuated by Goldman Sachs against the public.

*Second*, Plaintiff's claim under Section 349 is duplicative of her breach of contract claim. "[W]hen considering whether to dismiss a Section-349 claim as duplicative of a parallel breach-of-contract claim, a court inquires whether the act or practice giving rise to the Section 349-claim is misleading in a material

47

respect separate and apart from the allegations of breach of contract." *42-50 21st St. Realty LLC* v. *First Central Savings Bank*, No. 20 Civ. 5370 (RPK) (RLM), 2022 WL 1004187, at *10 (E.D.N.Y. Apr. 4, 2022) (internal citation and quotation marks omitted)).  To a significant degree, Counts 4 (breach of contract) and 8 (violation of Section 349) of Plaintiff's Amended Complaint are premised on the same argument: that Defendants agreed to "resolve the Mortgage Servicer issues presented and to ensure the Mortgage statements were corrected[.]"  (Am. Compl. 22; *see also id.* 15-16).  Accordingly, since the Court cannot find a material difference between these allegations, Count 8 is dismissed as duplicative.  *See Polk* v. *Del Gatto, Inc.*, No. 21 Civ. 129 (PAE), 2021 WL 3146291, at *11 (S.D.N.Y. July 23, 2021) ("Because the Complaint does not adequately differentiate between the breach of contract and GBL § 349 claims, the Court dismisses the latter as duplicative.").

### 3.    Plaintiff Fails to State a Claim for Perjury

Finally, Plaintiff contends that Morreale committed perjury during the parties' appearance before the Court on July 7, 2021, by stating: "they continue to say they're right, and I have not seen anything that says they're not right" in reference to Defendants' position on Plaintiff's mortgage statements. (Am. Compl. 23; *see also* Dkt. #19 at 39-40).  As alleged by Plaintiff, Morreale had seen the 2010 Quicken Loans Mortgage Refinance Contract (attached to Plaintiff's Amended Complaint as Exhibit 6), which should have apprised him of the correct mortgage statement and account information.  (Am. Compl. 23). Defendants argue that there is no general civil cause of action for perjury, and

that Defendants never made a false statement.  (Def. Br. 21-22).  The Court

need not wade into the merits of this dispute, because it agrees that there is no

private right of action for perjury.  *See Orrigo* v. *Knipfing*, 564 F. Supp. 3d 273,

283 (E.D.N.Y. 2021) ("'[F]orgery and perjury are crimes and therefore do not

give rise to civil causes of action.'" (citing *Luckett* v. *Bure*, 290 F.3d 493, 497

(2d Cir. 2002) (internal alterations omitted)).  Accordingly, Plaintiff's perjury

claim is dismissed.

### E.   The Court Denies Leave to Amend

The Court concludes by addressing whether to grant Plaintiff leave to

amend.  Federal Rule of Civil Procedure 15(a)(2) provides that a court should

freely give leave to amend "when justice so requires."  Fed. R. Civ. P.

15(a)(2); *see also McCarthy* v. *Dun & Bradstreet Corp.*, 482 F.3d 184, 200 (2d

Cir. 2007).  That said, it is "within the sound discretion of the district court to

grant or deny leave to amend."  *Broidy Cap. Mgmt. LLC* v. *Benomar*, 944 F.3d

436, 447 (2d Cir. 2019).  Leave may be denied where the proposed amendment

would be futile.  *See Olson* v. *Major League Baseball*, 447 F. Supp. 3d 174, 177

(S.D.N.Y. 2020).  Amendment is futile if the "amended portion of the complaint

would fail to state a cause of action[.]"  *Parker* v. *Columbia Pictures Indus.*, 204

F.3d 326, 339 (2d Cir. 2000); *see also Kassner* v. *2nd Ave. Delicatessen Inc.*,

496 F.3d 229, 244 (2d Cir. 2007) (finding amendment not futile where

amended complaint would be "sufficient to withstand a motion to dismiss").

Here, the Court finds that further amendments to Plaintiff's pleading

would be futile.  Following a pre-motion conference in this case, the Court

advised Plaintiff regarding her ability to amend her complaint in light of
Defendants' pre-motion submissions and the parties' arguments.  (*See* Dkt.
#19 at 43-44).  The Court allowed Plaintiff over two months to amend the
complaint, and Plaintiff availed herself of the opportunity.  Still, the Amended
Complaint is deficient on all counts, and further amendment would be futile.
"Where the problems with the causes of action are substantive and would not
be cured with better pleading, repleading would be futile." *Tasaka*, 2022 WL
992472, at *9 (citing *Cuoco* v. *Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000)).
Many of Plaintiff's claims are barred by the explicit terms of the Settlement
Agreement.  Further, they rest on "an inaccurate view of the law, and thus
cannot be repaired through amendment." *Knox* v. *Countrywide Bank*, 4 F.
Supp. 3d 499, 514 (E.D.N.Y. 2014) (dismissing *pro se* plaintiff's claims and
denying leave to amend).  As to Plaintiff's fraud claims, Plaintiff has had two
opportunities to comply with the requirements of Rule 9(b), and has not
pleaded her allegations with the specificity required by the Rule.  This is
particularly clear as it relates to Plaintiff's deficient scienter allegations, which
are contradicted by Plaintiff's own statements in her Amended Complaint and
opposition, as well as Plaintiff's attachments.  *See id.* ("The second fraud theory
fails because of admissions contained in the complaint itself, and any
amendment would necessarily conflict with those admissions.").  Accordingly,
the Court denies Plaintiff leave to amend and will dismiss her claims with
prejudice.

**CONCLUSION**

For the aforementioned reasons, the Court GRANTS Defendants' motion to dismiss with prejudice.

The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:   August 9, 2022
         New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge